# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MAINE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Bradley Young, | ) | Chapter 13 |
| | ) | Case No. 06-10569 |
| Debtor | ) | |
| _____ | ) | |
| In re: | ) | |
| | ) | |
| Denise Young, | ) | Chapter 13 |
| | ) | Case No. 07-10335 |
| Debtor | ) | |
| _____ | ) | |
| | ) | |
| Bradley and Denise Young | ) | |
| | ) | |
| Plaintiffs | ) | Adv. Proc. No. 07-1008 |
| | ) | |
| v. | ) | |
| | ) | |
| Camelot Homes, Inc., | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION

The debtors, Bradley and Denise Young, have separate chapter 13 cases pending under

joint administration.  Camelot Homes, Inc. ("Camelot") holds an identical undisputed claim in

each case secured by a judgment lien.  This adversary proceeding is an action under several

provisions of §§ 506 and 522 of the Bankruptcy Code to bifurcate Camelot's claim into secured

and unsecured claims and to avoid the judgment lien on exempt property.[1]

Camelot asserts that its claim is secured by certain real property known as the "storage

---

[1] References to the "Bankruptcy Code" or the "Code" are to the Bankruptcy Reform Act
of 1978, as amended, 11 U.S.C. § 101, et seq. (2008).  Unless otherwise indicated, references to
statutory sections are to sections of the Code.

facility," the debtors' residence, and four vehicles (the Honda, the Ford, the Dodge [including a plow], and the BMW). Bradley has claimed the Ford and the Dodge as exempt property. Denise has claimed exemptions in the Honda and her one-half interest in the residence. Camelot has objected to the claimed tools of the trade exemption in the Dodge but has conceded all of the other exemptions of concern in this proceeding. The parties have reserved the quarrel on the Dodge for the hearing on confirmation. The value of the debtors' non-exempt interests in the property securing the lien is the major factual dispute in this action.

Before the court is the debtors' motion for summary judgment. The debtors have offered evidence of value in affidavits and examination transcripts. Camelot has objected to the adequacy of the debtors' affidavits but has not offered its own admissible evidence of value. Camelot's objections will be overruled and partial summary judgment shall be granted to the debtors as follows:

(1) Camelot's claim shall not be secured by the storage facility or Bradley's interest in the residence and, consequently, its lien on those properties is void;

(2) Camelot's lien shall be avoided to the extent of the exemptions allowed in the Ford ($2,665.00), the Dodge ($235), the Honda ($1,435.00), and Denise's interest in the residence ($35,000.00); and

(3) Camelot's claim shall be secured by Denise's non-exempt interest in the residence ($60,000.00).

Final determination of Camelot's secured and unsecured claims shall be made following further evidentiary hearing in conjunction with confirmation on the replacement value of each vehicle and the allowance of the tools of trade exemption in the Dodge.

2

## JURISDICTION

 The district court has original, but not exclusive jurisdiction of all civil proceedings arising under the Bankruptcy Code.  <u>See</u>  28 U.S.C. § 1334(b).  This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (F), and (K).  As such, it has been referred to this court for final determination.  <u>See</u>  28 U.S.C. § 157(a); D. Me. Civil Rule 83.6(a).  Venue is appropriate under 28 U.S.C. § 1409(a).

## BACKGROUND

### The Lien

 Camelot obtained two judgments against the debtors in state court arising from arbitration awards.  The dispute was over the balance due Camelot for the delivery and installation of the manufactured home that is the debtors' residence.  A writ of execution was entered in the amount of $170,402.09, reflecting the amount of both judgments plus interest at the judgment rate.  The lien attached to the real property and vehicles when Camelot recorded the writ at the appropriate registries of deeds and the state bureau of motor vehicles.

### The Chapter 13 Cases

 Within 90 days of the perfection of Camelot's lien, the debtors filed their original joint chapter 13 petition.  The timing of the filing suggests that the debtors were motivated, at least in part, by a desire to avail themselves of the Bankruptcy Codes's lien avoidance provisions.  Recognizing the threat that bankruptcy posed to its security, Camelot moved to dismiss the case on many grounds including the charge that the debtors had exceeded the debt ceiling for chapter

13.[2]  The trustee filed a similar motion.  Camelot's motion was denied when Denise agreed to

file a separate petition with the trustee's consent.  There are now two individual cases under the

joint administration of the standing trustee.

### The Exemptions

Several exemptions have been claimed by the debtors under Maine law.[3]  Of concern in

this litigation are Bradley's claims with respect to the Ford and the Dodge and Denise's claims

with respect to the Honda and her one-half interest in the residence.

Bradley claimed the Ford to be exempt to the extent of $2,665.00 under the vehicle

exemption and the Dodge to be exempt to the extent of $5,235.00 under a combination of the

tools of trade exemption ($5,0000.00) and a small portion of the unused residence exemption

($235.00).  Camelot has conceded the exemption claimed in the Ford and on that basis it will be

allowed.[4]  Camelot objected to Bradley's application of the tools of trade exemption to the

Dodge.  By agreement of the parties, that dispute has been reserved for the hearing on

---

[2]  The ceiling for secured debt is $922,975.00 and the ceiling for unsecured debt is $307,675.00.  See 11 U.S.C. § 109(e).  The original joint schedules show an allocation of debt to each individual that falls within these limits.  The schedules filed by Denise after the cases were separated support this conclusion.

[3]  An individual debtor may exempt an interest in property from the estate created upon the commencement of a bankruptcy case.  See § 522 (b)(1).  State law governs exemptions for debtors residing in Maine.  See  § 522 (b)(2); 14 M.R.S.A. § 4426; In re MacLeod, 295 B.R. 1, 4 (Bankr. D. Me. 2003).  State law provides that certain "property is exempt from attachment and execution, except to the extent that it has been fraudulently conveyed by the debtor."  14 M.R.S.A. § 4422.  The applicable state exemptions in this proceeding include the residence exemption of $35,000.00, the vehicle exemption of $5,000.00, the tools of trade exemption of $5,000.00, and the unused portion of the residence exemption up to $6,000.00.  See 14 M.R.S.A. § 4422 (1), (2), (5), and (16).

[4]  In the absence of a timely objection, a claim of exemption will be allowed.  See Taylor v. Freeland & Kronz, 503 U.S. 638, 644 (1992).

confirmation.

Denise claimed her one-half interest in the family home to be exempt to the extent of

$35,000.00.  She also claimed the jointly owned Honda to be exempt to the full extent of its

scheduled value of $1,435.00 even though the value of her interest is shown as $717.50.  Both

exemptions will be allowed because neither the trustee nor Camelot has raised an objection.  See

Taylor, 503 U.S. at 644.[5]

### Camelot's Claim

Camelot filed a secured proof of claim in the amount of $174,729.94.[6]  No objection to

the amount of the claim or to the validity of the judgment lien has been raised in this adversary

proceeding.[7]  So, for present purposes, Camelot holds an allowed claim secured by a valid

judgment lien.

### The Chapter 13 Plans

In virtually identical plans, the debtors call for the bifurcation of Camelot's claim into

---

[5]  A claim of exemption should be viewed as a reasonable trustee would understand it.
See Barroso-Herrans v. Lugo-Mender (In re Barroso-Herrans), 524 F.3d 341, 344 (1st Cir. 2008).
Denise's claim of more than her one-half interest in the Honda is beyond doubt.  The trustee has
posed no objection.  Taylor applies and her claim with respect to the Honda will be allowed as
made.

[6]  The proof of claim reflects the amount of the writ of execution plus pre-bankruptcy
interest in the amount of $4,327.85 calculated at the judgment rate of 10.36%. Camelot asserts
that interest continues to accrue at $46.536 per day.  Camelot will be entitled to post-petition
interest, fees, cost, and charges if, and to the extent, the value of the property securing its claim
exceeds the amount of its claim.  See § 506 (b).

[7]  A claim is deemed allowed unless a party in interest objects.  See § 502 (a); FED. R.
BANKR. P. 3001(f); D. Me. L.B.R. 3015-3(d)(1).  In this district, a debtor's objection to a claim
may be joined with a request to avoid a lien in a motion to allow and disallow claims.  See D.
Me. L.B.R. 3015-3(d)(3).  Bradley and Denise have opted to press for bifurcation and lien
avoidance in this adversary proceeding without raising an objection to the claim or the validity
of the lien.

secured and unsecured claims and for the avoidance of Camelot's lien.  This adversary proceeding was commenced by the debtors to implement their plans.  For that reason, it is a prelude to confirmation.

The standing trustee has objected to the confirmation of both plans.  The hearing on confirmation has been deferred pending a decision in this adversary proceeding.

### The Pleadings

Three issues were framed in the pleadings:  First, whether Camelot's lien is voidable under § 547(b); second, whether and to what extent Camelot's claim may be bifurcated into secured and unsecured claims under § 506(a)(1); and, third, whether and to what extent Camelot's lien is avoidable under § 522(f).  A fourth issue was implied:  Whether and to what extent Camelot's lien is void under § 506(d).  Subsection (d) is implicated when bifurcation under § 506(a)(1) is invoked.  See 4 COLLIER ON BANKRUPTCY ¶ 506.06[4][b][i] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.)[hereinafter Collier].  Subsection (d) provides, with exceptions not applicable here, that a lien is void to the extent that it secures a claim which is not an allowed secured claim.[8]

Camelot's two affirmative defenses – lack of subject matter jurisdiction and failure to

---

[8]  Section 506(d) states:

To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless –
   (1)     such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or
   (2)     such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

state a claim upon which relief can be granted – are grounded in its original contention that the

debtors lack eligibility to be chapter 13 debtors under § 109(e).  Both affirmative defenses fail

because the debtors' eligibility under § 109(e) has been established by an order in the main case.

On summary judgment the debtors limited their demand for avoidance under § 547(b) to

the extent of the value of their exemptions under § 522(h).[9]  Camelot also raised a new issue of

its own:  Whether the value of Denise's one-half interest in the residence should be measured as

if it were to be sold with Bradley's interest by her trustee under § 363(h).

The primary issues are now:  (1) Whether and to what extent Camelot's claim may be

bifurcated into secured and unsecured claims under § 506(a)(1); (2) whether and to what extent

Camelot's lien is void under § 506(d); (3) whether and to what extent Camelot's lien may be

avoided under § 522(f); (4) whether and to what extent Camelot's lien may be avoided under

§ 522(h); and (5) whether the value of Denise's one-half interest in the residence should be

measured as if it were to be sold with Bradley's interest under § 363(h).

## THE LEGAL FRAMEWORK

An understanding of the legal issues raised in the pleadings will be helpful before we

move on to the summary judgment motion.

## Bifurcation Under § 506(a)(1)

---

[9]  "When an issue not raised by the pleadings is tried by the parties' express or implied
consent, it must be treated in all respects as if raised in the pleadings."  See FED. R. CIV. P
15(b)(2); FED. R. BANKR. P. 7015.

The principle of claim bifurcation is expressed in § 506(a)(1).[10]  Bifurcation permits an allowed claim to be a secured claim to the extent of the value of the claimant's interest in the estate's interest in the property securing the claim and an unsecured claim to the extent that the value of the claimant's interest in such property is less than the amount of its claim.[11]

Another way of putting it is that "section 506(a) requires a bifurcation of a 'partially secured' or 'undersecured' claim into separate (and independent) secured and unsecured claims." 4 Collier ¶ 506.03 [4].  Bifurcation is often a complex process:

> To separate the secured from the unsecured portion of a claim, a court must compare the creditor's claim to the value of "such property," i.e., the collateral. That comparison is sometimes complicated.  A debtor may own only a part interest in the property pledged as collateral, in which case the court will be required to ascertain the "estate's interest" in the collateral.  Or, a creditor may hold a junior or subordinate lien, which would require the court to ascertain the creditor's interest in the collateral.

---

[10]  Section 506(a)(1) provides:
> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extend that the value of such creditor's interest or the amount so subject to set off (sic) is less than the amount of such allowed claim.  Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

[11]  There are exceptions to bifurcation.  A chapter 13 debtor may not bifurcate a claim secured only by a security interest in real property that is a principal residence.  See § 1322(b)(2).  Also, under the so-called "hanging paragraph" of § 1325 (b), bifurcation will not apply to a claim secured by a purchase money security interest in a motor vehicle acquired for personal use by the debtor within the 910 days of bankruptcy or, when the collateral consists of any other thing of value, if the debt was incurred within one year of bankruptcy.  See In re Look, 383 B.R. 210, 214 (Bankr. D. Me. 2008); In re Littlefield, 2008 WL 2170542, *5 (Bankr. D. Me. 2008).  None of those exceptions are implicated in this case.

Associates Commercial Corp. v. Rash, 520 U.S. 953, 961 (1997).

The circumstances will dictate the assignment of the burden of proof on the question of value. See 4 Collier ¶ 506.03[9]. This proceeding was commenced by the debtors to gain the confirmation of their chapter 13 plans with a cram-down of Camelot's secured claim. To accomplish that they must meet the requirements of § 1325(a)(5). To meet those requirements, without Camelot's acceptance or surrendering the collateral to Camelot, the debtors must show that the value of the property they will distribute to Camelot on account of its lien will be no be less than the value of its secured claim. See § 1325(a)(5)(B)(ii). So the burden of proof falls on them. See AMFAC Distr. Corp. v. Wolff (In re Wolff), 22 B.R. 510, 512 (9th Cir. B.A.P. 1982).

The standard for determining value is set according to the purpose of the valuation and the proposed disposition or use of the property securing an allowed claim. See Rash, 520 U.S. at 961. The purpose of the valuation in this case is the cram-down of Camelot's claim. After the cram-down, the property is to be retained by the debtors. With that purpose and that proposed use, replacement value is the proper standard. Id. at 965.[12]

Before BAPCPA, § 506(a) did not fix a precise moment in time for determining the value of property securing an allowed claim.[13] That assignment was left to the courts. A range of

---

[12] The collateral in Rash was a commercial truck. The same standard applies to commercial and residential real estate. See In re Winthrop Old Farm Nurseries, 50 F.3d 72, 75 (1st Cir. 1995)(commercial real estate)(cited favorably in Rash, 520 U.S. at 963); In re Taffi, 96 F.3d 1190, 1192 (9th Cir. 1996)(en banc)(residential real estate)(cited favorably in Rash, 520 U.S. at 959, n. 2).

[13] BAPCPA is the acronym for the Bankruptcy Abuse Prevention and Consumer Protection Act, Pub. L. No. 109-8 (2005), which became effective before this case was filed.

opinions on timing was expressed before and after Rash.[14]  Rash itself is vague on the subject.

BAPCPA partially settled the question with respect to personal property in cases under chapters 7 and 13 by adopting replacement value as the standard of value and fixing the point of determination as the petition date.  See § 506(a)(2).[15]  The parties have not challenged this reading of § 506(a)(2).[16]  Thus, replacement value as of the petition date will be the standard for

---

[14]   Some courts said that collateral should be valued as of the date of the petition date for the confirmation of a chapter 13 plan.  See, e.g., Johnson v. GMAC (In re Johnson), 165 B.R. 524, 528 (S.D. Ga. 1994).  Others decided that value should be set as of the date the valuation proceedings are initiated.  See, e.g., Virginia Nat'l Bank v. Jones, 5 B.R. 736, 739 (Bankr, E.D. Va. 1980).  And others said it should be the date that a plan is filed, see, e.g., GMAC v. Chapman (In re Chapman), 135 B.R. 11,13 (Bankr. M. D. Pa. 1990); the date of the valuation hearing, see, e.g., Bank of Am. v. Byrd (In re Byrd), 250 B.R. 449, 451 (Bankr. M.D. Ga. 2000); or the effective date of the plan, see, e.g., In re Ibarra, 235 B.R. 204, 213 (Bankr. D. P. R. 1999).

[15]  BAPCPA retained subsection (a) of § 506 as paragraph (a)(1) and added paragraph (a)(2).  Section 506(a)(2) provides:

If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing.  With respect to property acquired for personal, family, or household purposes, replacement value shall mean, the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

[16]   Although it is not an issue in this case, one could say that Congress left the point of determination open with respect to personal property acquired for personal, family, or household use.  See, e.g., In re Coleman, 373 B.R. 907, 912 (Bankr. W. D. Mo. 2007)(holding that valuation of property acquired for personal, family or household purposes should, pursuant to § 506(a)(2), be valued as of the time the value determination is being made).  But the better reading of the new paragraph is the one expressed by the Bankruptcy Court of the Central District of California:

[A] full view of the interaction between the first and second sentences of § 506(a)(2) favors valuation as of the petition date.  By its own terms, the second sentence only establishes a specific definition of the general term "replacement value" to be used for certain property.  The second sentence thus functions to

evaluating each vehicle in this case.

BAPCPA did not tamper with the judicial standard for evaluating real property in a cram-down situation.  See supra, note 12.  Replacement value remains the standard when real property is to be retained by the debtor.  BAPCPA also left the time for determining the value of real property to the courts.

The petition date is the appropriate time for determining the value of the real property securing Camelot's lien for two reasons.  First, no one has pressed for a different point in time.  Second, bifurcation requires knowledge of the extent of the creditor's interest in the estate's interest in property.  The estate's interest in property (with exceptions not relevant here) is established upon the commencement of the bankruptcy case.  See § 541(a)(1).  Therefore, to learn the extent of Camelot's interest in the real property, we must know the value of each estate's interest in the real property on the petition date.

### § 506(d)

As mentioned above, paragraph (d) of § 506 is implicated when bifurcation occurs under paragraph (a)(1).  Paragraph (d) provides, with exceptions not applicable here, that a lien is void to the extent that it secures a claim that is not an allowed secured claim.  See supra, note 8.  When such a lien is void, it "is preserved for the benefit of the estate but only with respect to

---

provide a definition for a single term in the first sentence.  No more, no less.  This definition does not alter the requirement that courts not deduct for costs of sale or marketing, nor should it alter the valuation date established in the first sentence.

In re Morales, 2008 WL 1990369, p.10 (Bankr. C. D. Cal. 2008).

property of the estate." See § 551.[17]

Although, in part, Camelot's lien may secure a claim that is not a secured claim, no

portion of its lien will be preserved for the benefit of the estate. This is so because, under the

circumstances of this case, the estate's interest in the property subject to Camelot's lien will be

consumed by liens senior to Camelot, Camelot's lien, or the debtors' exemptions.

### Impairment of Exemptions Under § 522(f)(2)(A)

When a judicial lien impairs an exemption, it may be avoided under § 522(f). See In re

Barrett, 370 B.R. 1, 2 (Bankr. D. Me, 2007). A judicial lien impairs an exemption "to the extent

that the sum of – (i) the lien; (ii) all other liens on the property; and (iii) the amount of the

exemption that the debtor could claim if there were no liens on the property; exceeds the value

that the debtor's interest in the property would have in the absence of any liens." § 522(f)(2)(A).


Although Camelot has disputed the value of every property interest in this litigation, it

has conceded the amount of each exemption (other than the tool of trade exemption in the

Dodge) claimed by the debtors. Thus, the amount of each undisputed exemption has been fixed

as follows: $1,435.00 for the Honda, $2,665.00 for the Ford, $235.00 for the Dodge, and

$35,000.00 for Denise's one-half interest in the residence.[18] When each amount is plugged into

the impairment formula, the debtor's interest in each item is impaired by Camelot's lien.

---

[17] Section 551 states: "Any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or any lien void under section 506(d) of this title, is preserved for the benefit of the estate but only with respect to property of the estate." The purpose of Section 551 is to prevent a windfall to junior lienors that would otherwise result when a trustee avoids a senior lien. See In re Blanks, 64 B.R. 467, 469 (Bankr, E.D.N.C. 1986). In this case, there are no junior lienholders.

[18] See Nelson v. Scala, 192 F.3d 32, 33-34 (1st Cir. 1999), discussing application of § 522(f) where spouses' homestead interests are encumbered unequally.

Therefore, Camelot's lien may be avoided to the extent of the amount of each undisputed exemption.[19]

### § 522(h)

When a trustee does not attempt to avoid a transfer of property that could have been avoided under § 547(b), such transfer may be avoided by a debtor under § 522(h) to the extent such property is exempt.[20]

There are five requirements for avoidance under § 547(b). There must be: (1) a transfer to or for the benefit of a creditor; (2) for or on account of an antecedent debt; (3) made while the debtor was insolvent; (4) made on or before the petition date (when the creditor is not an insider); (5) that enables such creditor to receive greater benefit. See § 547(b)(1) - (5). Camelot admitted requirements (1), (2), and (4) in its answer and denied (3) and (5). However, those denials are without effect.

With respect to § 547(b)(3), a debtor's insolvency is presumed during the 90 days prior to bankruptcy. See § 547(f). Camelot has offered no refutation of that presumption. With respect to § 547(b)(5), the undisputed existence of other unsecured claims suggests that Camelot is likely to receive greater benefit in this case as a lienholder than as an unsecured creditor.

_____

[19] Notwithstanding § 551, a lien avoided under paragraphs (f) and (h) of § 522 may be preserved for the benefit of the debtor. See § 522(i).

[20] Section 522(h) provides:

The debtor may avoid a transfer of property of the debtor or recover a setoff to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if --
    (1)(A)  such transfer is avoidable by the trustee under section 544, 545, 547, 548, 549, or 724(a) of this title or recoverable by the trustee under section 553 of this title; and
      (B) the trustee does not attempt to avoid such transfer.

13

The apparent satisfaction of all five § 547(b) requirements means that the trustee could have avoided Camelot's lien for the benefit of the estate. His failure to pursue avoidance allows the debtors to avoid Camelot's lien to the extent of their allowed exemptions under § 522(h) because the lien was an involuntary transfer, the property was not concealed by the debtors and the lien is a judgment lien. See § 522(g).[21]

## § 363(h)

The debtors assert that the value of Denise's interest in the family residence is no more than the amount of her $35,000.00 allowed exemption. They point out that her interest is a one-half interest in a tenancy in common; that the other co-tenant is her husband Bradley; and that there is a debt on Bradley's interest in excess of the value of his interest secured by a mortgage held by First Horizon Home Loan Corporation ("First Horizon") which is senior to Camelot's lien.[22] The debtors argue that these circumstances will depress the fair market value of Denise's interest and that a buyer, if one could be found, would pay no more than a pittance to acquire her

---

[21] Section 522(g) provides:

Notwithstanding section 550 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if --
    (1)(A)  such transfer was not a voluntary transfer of such property by the debtor; and
     (B)  the debtor did not conceal such property; or
    (2)    the debtor could have avoided such transfer under subsection (f)(1)(B) of this section.

[22] Although it is not abundantly clear from the record, it appears that the property was acquired by Bradley and Denise as joint tenants with equal undivided shares in the residence. For unknown reasons, Denise is not a party to the First Horizon note and mortgage. The transfer of Bradley's interest to First Horizon would have made both spouses tenants in common as a matter of law. See Szelenyi v. Miller, 674 A.2d 769, 770 (Me. 1989).

interest (and move in with her husband, so to speak).

Camelot rejects that notion and insists that the value of Denise's interest must be determined as one-half of the whole value of the residence, rather than as a free standing interest of diminished value.  To support its position, Camelot asserts that an actual sale of the whole by Denise's trustee could be conducted under § 363(h).  Paragraph (h) allows a trustee to sell the interest of any co-owner along with the estate's interest in any property if (1) partition is impracticable, (2) sale of the estate's interest would realize significantly less for the estate than a sale of the whole free and clear of the co-owner's interest, (3) the benefit to the estate from such a sale outweighs any detriment to the co-owner, and (4) the property is not used in the production of electricity or gas for heat, light or power.  See § 363(h).

Needless to say, the debtors argue that § 363(h) is not applicable in this instance.  Their primary contention is that, even if all of the conditions of paragraph (h) are met, a sale of Bradley's interest could not take place without the consent of First Horizon.  Perhaps.  But questions involving First Horizon must wait until that lender is joined as a party in a proper adversary proceeding.[23]

Nonetheless, Camelot's point – that the value of Denise's interest must be determined as one-half of the value of the whole residence, rather than as a free standing interest of diminished value – is valid without support from § 363(h).  The standard for measuring the value of property to be retained in a cram-down situation is replacement value.  The replacement value of Denise's interest is what she would have had to have paid in the marketplace on the petition date to

---

[23]  Issues concerning the sale of a co-owner's interest under § 363(h) must be determined in an adversary proceeding with the joinder of all necessary parties.  See Fed. R. Bankr. P. 7001(3).  As the holder of a mortgage on Bradley's interest in the residence, First Horizon would be a necessary party.

duplicate her living accommodations.  To arrive at the correct value of her interest we must

determine the replacement value of the entire residence on the petition date and divide it in half.

### SUMMARY JUDGMENT

Summary judgment should be rendered when, after reviewing the facts in the light most

favorable to the non-moving party, it appears from the pleadings, depositions, answers to

interrogatories and admissions, together with affidavits, if any, that there is no genuine issue as

to any material fact and the moving party is entitled to judgment as a matter of law.  See FED. R.

CIV. P. 56(c).[24]  When plaintiffs are the moving parties, as they are in this instance, they must

show the existence of the essential elements of their claims, before the burden shifts to the

defendant to demonstrate through admissible evidence that there is a genuine issue for trial.  See

Celotex Corp. v. Catrett, 477 U.S. 316, 324 (1986).

In this district the local rules of the district court govern proceedings on summary

judgment in the bankruptcy court.  See D. Me. LBR 9029-3; D. Me. Civil Rule 56.  The moving

party is required to file a statement of material facts, supported by record citations, as to which it

contends there is no genuine issue of material fact to be tried.  See D. Me. Civil Rule 56(b).  The

opposing party is required to submit an opposing statement admitting, denying, or qualifying the

facts in the moving party's statement.  Denials and qualifications must be supported by record

citations.  The opposing party may add a section of additional facts.  See D. Me. Civil Rule 56(c).

If supported by record citations, the facts contained in the supporting and opposing statements

are deemed admitted unless properly controverted.  See D. Me. Civil Rule 56(f).  The court has

no independent duty to search or consider any part of the record not specifically referenced in the

parties' separate statements.  See D. Me. Civil Rule 56(f).

---

[24]  FED. R. CIV. P. 56 is applicable through FED. R. BANKR. P. 7056.

16

The debtors filed a statement of material facts supported by an affidavit from each debtor and transcripts from two FED. R. BANKR. P. 2004 examinations of Bradley taken by Camelot. Camelot responded with an opposing statement admitting, denying, or qualifying the debtors' contentions.  Camelot's denials and qualifications are not supported by record citations of its own making.[25]  Instead, Camelot has challenged the adequacy of the debtors' affidavits and offered sharp critiques of the debtors' factual assertions.

FED. R. CIV. P. 56(e)(1) requires that an affidavit "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  But the rule does not prescribe a specific form of affidavit.  The debtors' initial affidavits show that the witnesses were sworn, that they were competent to testify, and that their testimony was based upon personal knowledge.  However, contrary to custom, their jurats said that their statements were made as their free act and deed.

Camelot objected to the form of the debtors' jurats on grounds that a witness must affirm the truth of his or her statements to the best of his or her knowledge, information and belief.  See Pfeil v. Rogers, 757 F.2d 850, 859 (7th Cir. 1985); Lentz v. Spanky's Restaurant II, Inc., 491 F. Supp 663, 670 (N. D. Tex. 2007).

Camelot also cited Pineland Lumber Co. v. Robinson, 382 A.2d 33 (Me. 1978) as authority for rejecting the affidavits.  That case involved the use of the free act and deed jurat on a notice of lien presented under the Maine mechanic's lien statute.  The Maine Law Court excluded the notice of lien under the strict construction standard applicable to such laws and held

---

[25] Camelot's references to the affidavit of its attorney and the appraisals attached thereto have been ignored.  Camelot missed the deadline for the disclosure of its expert witnesses under the pretrial scheduling order and its motion to extend that deadline was denied following hearing.

that a notice of lien "must be complete in itself, showing on its face that it is a statement properly verified on oath, which only the affixed jurat or certificate by the officer administering the oath can adduce." Id. at 38. Corrective action was impossible in Pineland because the statutory time period for recording a proper notice of lien had expired.

No similar time restriction applies in our case. Moreover, the debtors heeded Camelot's objection by immediately filing replacement affidavits with identical content and conforming jurats. Their prompt response did not delay the travel of the case or prejudice Camelot's defense. So even if the initial affidavits were deficient, the prompt action of the debtors solved the problem. Late affidavits may be accepted, see Lovelace v. Lee, 472 F.3d. 174, 204 (4th Cir. 2006), particularly when no new evidence is raised. See Baugh v. City of Milwaukee, 823 F. Supp. 1452, 1456-7 (E. D. Wis. 1993). For these reasons, Camelot's objections will be overruled and its motion to strike the affidavits will be denied.

### The Real Property

As an owner, Bradley is competent to render an opinion of value. See Robinson v. Watts Detective Agency, Inc., 68 F.2d 729, 738-9 (1st Cir. 1982). His affidavit establishes the replacement value of the entire residence at $190,000.00 as of the petition date. Bradley's opinion is supported by an appraisal obtained by First Horizon, another appraisal obtained by the debtors and a municipal tax bill. All of this overcomes Camelot's suggestion of a higher value during the cross examination of Bradley at the 2004 examination.[26]

Based upon a replacement value of $190,000.00, Bradley's one-half interest is worth $95,000.00. His interest is fully consumed by the mortgage debt of First Horizon in excess of

---

[26] The supplemental affidavit filed by Bradley in reply to Camelot's objection to summary judgment has been ignored.

that amount.

The replacement value of Denise's interest is also $95,000.00.  In light of her allowed exemption of $35,000.00, Camelot has a secured claim worth $60,000.00.

Bradley's affidavit and 2004 examination show that the replacement value of the storage facility was $400,000.00 on the petition date.  His opinion is based upon the municipal tax value and the actual sale price of a more modern and larger self-storage facility from the same area.  Camelot thoroughly reviewed his opinion at the 2004 examination.  Since the storage facility is fully secured by a senior mortgage debt in excess of $400,000.00, Camelot's claim is not secured by that property and its lien on that property is void.

### The Vehicles

The record shows Bradley's opinion of the "fair market value and replacement value" of each vehicle to be:

Honda:        $1,435.00

Ford:          $2,665.00

Dodge:         $5,235.00

BMW:          $18,240.00

If Bradley's opinions are accepted as accurate reflections of replacement value, Camelot's claim will not be secured by the Honda and the Ford because the value of each of those vehicles would be consumed by an allowed exemption.  The same will be true for the Dodge if the tools of trade exemption is allowed.  Similarly, the BMW could be beyond the reach of Camelot's lien because the record shows a prior lien on that vehicle in the amount of $19,061.83.

Bradley used the Kelley Blue Book ("Kelley") website to arrive at his opinions.  Kelley

values may be accepted as reliable market reports or compilations under Federal Rule of Evidence

801(17).  See In re Finnegan, 358 B.R. 644, 649 (Bankr. M. D. Pa. 2006); In re Bouzek, 311 B.R.

239, 243 (Bankr. E. D. Wis. 2004).  Bradley's opinions are admissible evidence in this instance

because he enhanced the Kelley values with specific information on the condition of each vehicle.

However, because Bradley used Kelley trade-in listings as the starting point of his analysis, his

opinions will not be taken as convincing evidence of replacement value.

Replacement value should reflect retail value of personal property on the date of

bankruptcy.  See supra, note 15.  Had Bradley used Kelley retail listings as the source of his

opinions, they would have been acceptable evidence of replacement value.  He did not and, for

that reason, the record does not support complete summary judgment on the bifurcation of

Camelot's claim.

Final determination of Camelot's secured and unsecured claims shall be made following

further evidentiary hearing in conjunction with confirmation on the replacement value of each

vehicle and the allowance of the tools of trade exemption in the Dodge.

### Conclusions

Partial summary judgment shall be granted to the debtors as follows:

(1) Camelot's claim shall not be secured by the storage facility or Bradley's interest in the

residence and, consequently, its lien on those properties is void;

(2) Camelot's lien shall be avoided to the extent of the exemptions allowed in the Ford

($2,665.00), the Dodge ($235), the Honda ($1,435.00), and Denise's interest in the residence

($35,000.00); and

(3) Camelot's claim shall be secured by Denise's non-exempt interest in the residence ($60,000.00).

DATED: July 2, 2008

_____
Louis H. Kornreich, Chief Judge
United States Bankruptcy Court